**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MONIQUE TOOLS,

CASE NO. 2:20-cv-13072

       *Plaintiff*,          DISTRICT JUDGE VICTORIA A. ROBERTS

*v.*                      MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 17, 19)**

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Monique Tools, is not disabled. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 17), **GRANT** the Commissioner's motion, (ECF No. 19), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff applied for supplemental security income ("SSI") on March 13, 2018, alleging that she became disabled on August 12, 2013. (ECF No. 13, PageID.63, 121, 239–44, 272.) The Social Security Administration denied her SSI claim on April 3, 2019. (*Id.* at PageID.115–20.) Plaintiff requested a hearing before an ALJ which was held on March 8, 2019. (*Id.* at PageID.77, 115–20, 142.)  On the same day as her hearing, Plaintiff

1

amended her initial onset date to March 13, 2018.  (*Id.* at PageID.272.)  The ALJ issued a decision on February 5, 2020, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at PageID.71.)  The Appeals Council denied review on September 24, 2020. (*Id.* at PageID.52.)

Plaintiff subsequently filed a complaint seeking judicial review of the ALJ's final decision on November 18, 2020.  (ECF No. 1.)  This case was referred to the undersigned the same day, and both parties later filed cross-motions for summary judgment.  (ECF Nos. 3, 13, 15.)

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v.

Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that

disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets
> or equals one of our listings in appendix 1 of this subpart and
> meets the duration requirement, we will find that you are
> disabled.
>
> (iv) At the fourth step, we consider our assessment of your
> residual functional capacity and your past relevant work. If you

> can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 13, PageID.71.) At step one, the ALJ found that Plaintiff had not

4

engaged in substantial gainful activity since March 13, 2018, the application date. (*Id.* at PageID.66.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: glaucoma, asthma, emphysema, hyperlipidemia, osteoarthritis of the hips, degenerative disc disease of the lumbar spine, osteoarthritis of the right foot, and posterior tibial tendon dysfunction of the right lower extremity. (*Id.*) The ALJ found that Plaintiff's alcoholic liver disease was a medically determinable impairment, but not severe. (*Id.*) At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment. (*Id.* at PageID.66–67.) Next, the ALJ determined that Plaintiff had a residual functioning capacity to perform light work,[1] except that Plaintiff could only perform:

> occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing and stooping; occasional kneeling, crouching, and crawling; occasional exposure to dusty environments; no exposure to extreme temperatures or extreme humidity; can avoid ordinary hazards in the workplace, but should avoid unprotected heights and operating heavy machinery; frequent visual acuity; and requires a sit/stand option with approximately 30 minutes in each position.

(ECF No. 13, PageID.67.) At step four, the ALJ found that Plaintiff had no past relevant work. (*Id.* at PageID.69.) At step five, the ALJ found that jobs which Plaintiff could perform existed in significant numbers in the national economy. (*Id.* at PageID.69–70.)

### E. Background

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2021).

## 1. Medical Evidence

Plaintiff alleges disability resulting from several impairments.  On appeal, however, Plaintiff only challenges the ALJ's findings regarding her drug side effects and her need for a cane and a walking boot.

Plaintiff sought emergency treatment on March 3, 2017, complaining of hip pain. (*Id.* at PageID.349.)  She told her doctor that she had to drag her right leg when she walked, and, upon examination, her doctor found that she displayed decreased strength in her right hip.  (*Id.* at PageID.349–50.)  However, her doctor also observed a normal range of motion and no swelling or deformities.  Notwithstanding her right hip, the rest of her exam was normal.  (*Id.* at PageID.350.)

During the same visit, medical staff performed an x-ray of Plaintiff's hips and a CT-scan of Plaintiff's lumbar spine.  (*Id.* at PageID.351.)  These tests revealed only mild osteoarthritis of the hips and only minor degenerative changes in of the lumbar spine.  (*Id.*) These findings were consistent with other examinations, performed between August 2017 and June 2018, showing a normal range of motion, normal gait, no joint tenderness, no deformities, no distress, no muscular tenderness, no swelling, and no back pain.  (*Id.* at PageID.368–70, 374, 392, 400–01.)   Notwithstanding her generally mild symptoms, Plaintiff's doctors recommended that she use either a walker or crutches after her March 2017 visit. (*Id.* at PageID.355.)

Over a year later, Plaintiff met with her physician to report pain in her right foot. (*Id.* at PageID.447.)  She reported that her right foot pain had been a recurring problem for which she once received an injection.  (*Id.*)  Although this injection relieved her pain

initially, her pain eventually returned.  (*Id.*)  Based on her reports and prior medical records, Plaintiff's physician recommended that she undergo an MRI of her right ankle.  (*Id.* at PageID.447–49.)  In the meantime, her doctor recommended that she wear "a walking boot for all standing and walking to decrease pain and swelling along [her] tendon."  (*Id.* at PageID.449.)

## 2.  Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff.  (*Id.* at PageID.84.)  She testified that she lived on the third floor of an apartment building and often took the stairs up to her unit.  (*Id.* at PageID.84–85.)  Although she had not recently worked, she testified that she left most of her prior jobs because she could not stand for a full shift.  (*Id.* at PageID.86–87.)  For example, Plaintiff left a past job at Subway which required her to stand for about six hours per day, four days per week after working there for only three months.  (*Id.* at PageID.87.)  She told the ALJ that she could stand for no more than thirty minutes at a time, and she could walk no more than "two blocks without getting out of breath."  (*Id.* at PageID.89.)

The ALJ observed that Plaintiff brought a cane to the hearing, and Plaintiff explained that her primary care physician prescribed the cane about two or three year prior. (*Id.* at PageID.90.)

The ALJ then asked Plaintiff whether she experienced any side effects from her medications.  (*Id.*)  Plaintiff responded she experienced "drowsiness," but nothing else. (*Id.*)  According to plaintiff, her medications caused her to nap often and made her

forgetful.  (*Id.*)  However, Plaintiff later went on to explain that she only took one or two naps per day, sometimes for as few as fifteen minutes.  (*Id.* at PageID.93.)

Plaintiff testified that she could dress herself, shower, cook, shop for groceries, sweep her floors, wash dishes, and clean her bathroom.  (*Id.* at PageID.91–92.)

### 3.  The VE's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.96.)  The ALJ assumed that Plaintiff had no past relevant work.  (*Id.*)  The ALJ then asked the VE whether there were any jobs in the national economy that a hypothetical person of the same age and educational level as Plaintiff could perform, provided that the hypothetical person could perform a limited range of sedentary work.  (*Id.*)  Specifically, this individual could "alternate between sitting and standing as necessary" and:

> occasionally perform pushing or pulling exertional maneuvers and perform all postural activities on an occasional basis, but should never climb ladders.  The claimant can work in any environment, avoiding even moderate exposure to respiratory irritants including dusty or contaminated environments, as well as extremes in temperature or humidity.  Additionally, she should avoid heights, as well as moving or dangerous machinery.  Mentally, the claimant is limited in engaging in tasks involving visual acuity on a frequent basis.

(*Id.*)  The VE replied that the hypothetical person could work as a bench hand, Dictionary of Occupational Titles ("DOT") code 715.684-026, sedentary work, more than 40,000 jobs; a final assembler, DOT code 713.687-018, sedentary work, more than 40,000 jobs; and a clerical sorter, DOT code 209.587-010, sedentary work, more than 35,000 jobs. (*Id.* at PageID.97.)

The ALJ then asked the VE to assume a hypothetical person who could perform light work except that they:

8

can climb ramps and stairs occasionally, can never climb ladders, ropes or scaffolds, can balance and stoop occasionally, can kneel, crouch and crawl occasionally.  Should only have occasional exposure to dusty environments, no exposure to extreme temperatures or extreme humidity.  Can avoid ordinary hazards in the workplace, but should avoid unprotected heights or operating hazardous machinery.

Can have frequent visual acuity, sit/stand option for approximately [thirty] minutes in each position.

(*Id.*)  The ALJ responded that this individual could find work as a hand packager, DOT code 559.687-074, light work, more than 35,000 jobs; a small products assembler, DOT code 706.684-022, light work, more than 35,000 jobs; and a "visual inspector, checker," DOT code 222.687-010, light work, more than 35,000 jobs. (*Id.* at PageID.97–98.)

Next, the ALJ asked whether the individual from the last hypothetical could find work in the national economy if they were further restricted to sedentary work.  (*Id.* at PageID.98.)  The VE testified that this individual could perform the same jobs as the individual described in the first hypothetical.  (*Id.*)

Last, the ALJ asked the VE to consider the prior hypothetical, but to also assume that the individual would be off task for at least twenty percent "of the workday due to pain or side effects from medication."  (*Id.*)  The VE responded that "[t]here would be no competitive full-time employment," for this individual.  (*Id.*)

After the VE answered the ALJ's hypotheticals, he explained that his testimony was generally consistent with the DOT, but that his testimony regarding "the exception of performing job tasks" and the "sit/stand option" was based on his personal knowledge. (*Id.*)

9

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the

11

persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

12

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*   The fourth factor of the SSA's analysis is "specialization."   In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."   These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5).   "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*   Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation

requirements."   The ALJ will consider "source-level articulation."   Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."  *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."  *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be."  *Id.* § 404.1520c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we

articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)   Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

> (ii)  Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)   Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504.   Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.*   The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).   Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*   Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood,

16

thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will

consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

    (3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

    (4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

    (5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ did not support her RFC finding with substantial evidence because she failed to adequately account for Plaintiff's cane and walking boot, and because she failed to consider Plaintiff's side effects from her medications.[2]  For the following reasons, I suggest that these arguments fail.

### 1. Plaintiff's Cane

Plaintiff first argues that the ALJ's RFC finding was not supported by substantial evidence because it failed to adequately account for her use of a cane.  (ECF No. 17, PageID.467–68.)  Specifically, Plaintiff explains that while the ALJ mentioned that "the medical records do not show a prescription for a cane," Plaintiff's doctors actually "recommended [that] Plaintiff use an assistive device to lower extremity pain."  (*Id.* at

---

[2] Plaintiff also makes a conclusory argument that "the ALJ neglected to properly account for" Plaintiff's "ability to stand or walk for prolonged periods . . ." without any further elaboration.  (ECF No. 17, PageID.467.)  I suggest that the Court should consider this argument waived—the Court need not entertain arguments that are underdeveloped.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1989).  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *Id.* at 995–96 (internal quotation marks omitted) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)); *see also Frazier v. Comm'r of Soc. Sec.*, No. 19-11097, 2020 WL 1856202, at *10 (E.D. Mich. Mar. 11, 2020), *report and recommendation adopted by* 2020 WL 1847923 (E.D. Mich. Apr. 13, 2020).

PageID.468.)  Indeed, after Plaintiff presented at a hospital with hip pain in March 2017, her physician recommended that she use an "assistive device (walker vs crutches)." (ECF No. 13, PageID.448–49.)  However, as "misleading," as Plaintiff believes the ALJ's description may have been, the ALJ could not have found that Plaintiff's cane was medically necessary.  (ECF No. 17, PageID.468.)

To find that a "hand-held assistive device," such as a walker or a cane, is medically required, the ALJ must identify "medical documentation" that (1) establishes "the need for a hand-held assistive device," and (2) "describe[es] the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).[3]  A physician might describe the circumstances for which an assistive device is needed by, for example, stating whether the claimant should use the device "all the time, periodically, or in certain situations . . . ." *Id.*  The physician might also state whether the device is necessary for certain "distance[s]" or "terrain[s]." *Id.*  Without both elements, a physician cannot find that a cane is "medically required." *Id.*; *see Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002) (applying SSR 96-9p to an RFC for a reduced range of light work)

Here, while Plaintiff's treatment note is a medical document that likely establishes her "need for a hand-held assistive device," it does not describe the circumstances in which the device would be necessary.  *See* SSR 96-9p, 1996 WL, at *7.  Indeed, Plaintiff's

---

[3] The Commissioner asks the Court to hold that Plaintiff cannot rely on her treatment note to establish that her cane is medically necessary because the treatment note only recommended the use of a walker or crutches. (ECF No. 19, PageID.486.)  I find this to be a distinction without a difference.  SSR 96-9p only requires documentation of "*a* hand-held assistive device." 1996 WL 374185, at *7 (emphasis added).  It does not require documentation of the specific device at issue, particularly when that device is less restrictive than what physicians recommended. *See id.*

physician simply wrote "assistive device (walker vs crutches)" under a heading titled "assessment and plan," without any further explanation.  (ECF No. 13, PageID.448–49.) Because Plaintiff's physician provided no information regarding the circumstances under which Plaintiff was to use the assistive device, the ALJ could not rely on this document to find that Plaintiff's cane was required.  *Cf. Sou v. Saul*, 799 F. App'x 563, 564–65 (9th Cir. 2020); *Downyell v. Kijazakim*, No. 20-07312, 2022 WL 971335, at *3 (C.D. Cal. Mar. 31, 2022); *Parrish v. Berryhill*, No. 1:16-1880, 2017 WL 2728394, at *12 (N.D. Ohio June 8, 2017).

And setting aside the fact that the ALJ could not, under the regulations, find that Plaintiff's cane was medically necessary, the record contains substantial evidence suggesting that Plaintiff did not require an assistive device.  To start, the record contradicts Plaintiff's testimony that she had a prescription for her cane—not only did none of her medical records show a prescription for a cane, but she once stated that she only used her cane "when needed."  (ECF No. 13, PageID.288, 426–45.)

Plaintiff's daily activities and medical records also suggest that she did not require a cane.  For example, Plaintiff cooked, washed dishes, swept her floor, cleaned her bathroom, and used the bus.  (*Id.* at PageID.40–41.)  A hip x-ray from March 2017 revealed only mild osteoarthritis, and a CT scan of her lumbar spine revealed only minor degenerative changes.  (*Id.* at PageID.345, 355, 360–62.)  Unsurprisingly then, at an examination in March 2017, Plaintiff displayed a normal range of motion in her hips and generally normal hip strength.  (*Id.* at PageID.344.)  Moreover, officials at Plaintiff's benefits interview observed that Plaintiff had no problems sitting, standing, or walking.

(*Id.* at PageID.285.)   At examinations in August 2017 and May 2018, Plaintiff failed to mention that she used a cane and she displayed a normal range of motion.   (*Id.* at PageID.368–70, 400–01, 407.)   And at examinations in September 2017 and June 2018, Plaintiff displayed a normal gait.   (*Id.* at PageID.374, 392.)

## 2.   Plaintiff's Walking Boot

Plaintiff also argues that the ALJ's RFC finding "failed to properly account for" her need to wear a walking boot.   (ECF No. 17, PageID.467.)   She explains that although the ALJ correctly recognized that she was "prescribed a walking boot for [pain] management," the ALJ failed to mention that Plaintiff's doctors instructed her to wear the boot "for all standing and walking," and she faults the ALJ for not questioning the VE about the impact of her boot on her ability to perform jobs.   (*Id.* at PageID.468–69.)

The thrust of Plaintiff's argument seems to be that the use of a walking boot, in itself, could affect her functional abilities; but it is not clear where exactly Plaintiff believes the ALJ erred.   (*Id.*)   Although muddled, her argument might be construed in one of two ways: either (1) that the ALJ erred by not including Plaintiff's walking boot as a functional limitation in her RFC and asking the VE, directly, whether a walking boot would impact Plaintiff's ability to find work; or (2) that the ALJ erred by not further limiting Plaintiff's functional abilities, such as Plaintiff's ability to walk or lift, to account for Plaintiff's use of a boot.   (*See id.*)   However, Plaintiff's argument fails under either reading.

First, the VE could not opine on whether Plaintiff's boot would impact her ability to perform jobs.   *See Mills v. Colvin*, No. 13-00014, 2014 WL 2618544, at *9–10 (W.D. Va. June 12, 2014) ("It is not the province of the VE to weigh medical evidence or to opine

that a medical condition could cause impairment.").  Asking the VE about the impacts of a walking boot on Plaintiff's ability to work would be tantamount to asking the VE to opine on Plaintiff's functional abilities.  That is not the VE's role.  The VE's task is to "assess the effect of any limitation on the range of work at issue" and "advise whether the impaired person's RFC permits him or her to perform" work in the national economy.  SSR 83-12, 1983 WL 31253, at *3 (Jan. 1, 1983); *see* 20 C.F.R. § 416.966(e) (2021).  Conversely, it is the ALJ, and the ALJ alone, who determines a claimant's functional abilities.  20 C.F.R. § 4946(c) (2021).

But wearing a "walking boot" is not a functional ability.  Under the regulations, a claimant's functional capacity is "the most [the claimant] can *do* despite [the claimant's] limitations."  *Id.* § 416.945(a)(1).  A functional ability, therefore, is an action—an activity related to job tasks that the claimant can or cannot perform.  *See id.*  Indeed, the regulations give examples of various functional abilities, all of which involve activities, rather than conditions.  *Id.* § 416.945(b)–(d).  Some of these activities are physical (such as walking, lifting, or sitting), while others are either mental (such as understanding or remembering), or sensory (such as sight and hearing).  *Id.*  Although a walking boot may affect one's ability to perform various actions, wearing a walking boot is a condition, not a functional ability.

To be sure, there are situations where an ALJ might appropriately ask a VE whether a condition would affect an individual's ability to perform a job.  However, this is only appropriate where the effects of a condition on one's functional abilities is so obvious that there would be no difference between asking whether a condition or its corresponding

limitations would affect an individual's ability to work.  For example, courts have held that ALJ's may ask a VE whether an individual could find work despite having a low IQ, but only because such a question would be "no different than" asking whether "a person limited to simple tasks can or cannot perform certain jobs."  *Gurney v. Soc. Sec. Admin. Comm'r*, 880 F. Supp. 2d 174, 178 (D. Me. 2012); *accord Amandalynn R. v. Kijakazi*, No. 20-00408, 2021 WL 5236494, at *5 n.9 (D. Me. Nov. 10, 2021).  Likewise, SSR 96-9p recognizes that because the use of a cane for ambulation can "significantly erode" the occupational base for a claimant, and ALJ may find it "useful to consult a vocational resource."  1996 WL 374185, at *7; *see also Frazier*, 2020 WL 1856202, at *10.  But even in these situations, the ALJ maintains the responsibility to determine the claimant's need for a cane and the circumstances surrounding the claimant's use of the cane.  SSR 96-9p, 1996 WL 347185, at *7.

A walking boot, however, would not have an obvious impact on an individual's functional abilities.  A boot may be prescribed to ameliorate a variety of underlying conditions, and the impact of a boot, itself, on an individual's physical abilities varies from person to person and must be considered on a case-by-case basis.  *Compare Cone v. Kijakazi*, No. 20-690, 2021 WL 4256471, at *7 (W.D. Okla. Sept. 17, 2021) ("[T]he use of such a [boot] does not necessarily result in any functional limitations."), a*nd Karen Jean M. v. Saul*, No. 19-2455, 2020 WL 5057488, at *7 (D. Kan. Aug. 27, 2020), *with Mooneyhan v. Kijakazi*, No. 21-421, 2022 WL 801286, at *2 (W.D. Okla. Mar. 15, 2022) ("Given that she was in a walking boot at the time, balancing would be difficult, and Dr. Goldstein did not think she could crawl.").  This case-by-case inquiry should be performed

by an ALJ when assessing a claimant's RFC, not by a VE. *See Cone*, 2021 WL 4256471, at *7.

So, although Plaintiff might argue otherwise, the VE could not opine on whether a walking boot would limit Plaintiff's ability to perform work. *See* SSR 83-12, 1983 WL 31253, at *3. Instead, the ALJ should have considered the impact of the boot on Plaintiff's functional abilities and then presented those functional abilities to the VE. *See* 20 C.F.R. § 4946(c).

But perhaps Plaintiff meant to argue that the ALJ's RFC findings do not adequately account for Plaintiff's use of a walking boot. Or in other words, the ALJ underestimated the boot's impact on Plaintiff's physical abilities like standing and walking. This argument, however, suffers from a fundamental flaw—Plaintiff does not explain how the use of her boot could affect her functional abilities. And without such a discussion, Plaintiff cannot demonstrate harmful error.

On appeal to the district court, the claimant bears the burden of proving not only that the ALJ erred, but that the ALJ's error was harmful, meaning that it "prejudiced" the claimant "on the merits or deprived [the claimant] of substantial rights." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)); Carolyn A, Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 9:57 (2019) (quoting *Shinseki v. Sanders*, 556 U.S. 396 (2009)). Even so, many errors cause a harm that is "obvious" to the reviewing court. *Kuotrakos v. Astrue*, 906 F. Supp. 2d 30, 38 (D. Conn. 2012). In these situations, the

claimant need not explain precisely how he or she was prejudiced.  *Shinseki*, 556 U.S. at 410.  But when a harm is not obvious, the moving party must "explain why the erroneous ruling caused harm."  *Id.*; *see McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011) (holding that *Shinseki* applies to social security cases).

Here, Plaintiff fails to carry her burden of proof in establishing both error and prejudice.  The ALJ crafted her RFC fully aware that Plaintiff wore a boot "when standing and walking," and she included several limitations that seem to account for Plaintiff's boot. (ECF No. 13, PageID.69, 468.)  Indeed, she limited Plaintiff to light work; she found that Plaintiff could not climb ladders, ropes, or scaffolds; and she limited Plaintiff to occasional balancing, stooping, and kneeling.  (*Id.* at PageID.67, 69.)  Plaintiff does not explain why these limitations do not adequately account for her walking boot, and she therefore cannot show that these limitations are not supported by substantial evidence.  (ECF No. 17.)

And for the same reasons, Plaintiff also fails to establish that she was prejudiced by the ALJ.  If there was a harm here, it was not obvious, and Plaintiff does not explain how her boot affected her functional abilities.[4]  Simply wearing a boot does not necessarily cause any functional limitations, so even if the ALJ had failed to account for Plaintiff's boot in her RFC, this might not have deprived Plaintiff of any additional functional limitations.  *See Cone*, 2021 WL 4256471, at *7.  Yet, the ALJ still found several limitations that might account for Plaintiff's need to wear a walking boot.

What more limitations the ALJ should have included—the Court could not possibly

---

[4] Plaintiff implies that it would be possible for additional functional limitations, related to her boot, to limit her to sedentary work, but she provides no further elaboration.  (ECF No. 17, PageID.469.)

know, and Plaintiff does not say.  *See Thomas v. Halter*, 131 F. Supp. 2d 942, 945 (E.D. Mich. 2001) (quotation marks omitted) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)) (explaining that the court need not scour the record for evidence in support of a part's argument); *cf. Abraham v. Comm'r of Soc. Sec.*, No. 18-12422, 2019 WL 5680809, at *8 (E.D. Mich. Aug. 17, 2019), *report and recommendation adopted by* 2019 WL 5680320 (E.D. Mich. Sept. 30, 2019) ("[Claimant] fails to identify any additional limitations stemming from her carpal tunnel syndrome."); *Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. June 27, 2013) ("Plaintiff does not specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment resulting from his pain or mental impairments."). Accordingly, I suggest because Plaintiff fails to identify any harmful error concerning the ALJ's consideration of her boot, the Court cannot reverse or remand on this ground.

### 3.    Medication Side Effects

Last, Plaintiff argues that the ALJ's RFC assessment was flawed in one other respect—the ALJ failed to consider Plaintiff's drowsiness, a side effect of her medication, on her ability to stay on task throughout the workday.

Under 20 C.F.R. § 416.929(c)(3)(iv) (2021), an ALJ must "consider" all evidence concerning a claimant's symptoms, including "side effects of any medication" taken by the claimant.  But to "consider" evidence does not necessarily mean to "mention" evidence. Indeed, "it is well settled that '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral*

*Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).  Rather, an ALJ need only "articulate the rationale underlying the decision," such that the district court can meaningfully review his or her reasoning.  *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at \*3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)).

While the ALJ did not mention Plaintiff's side effects, she appears to have considered them.  At the hearing, the ALJ asked Plaintiff whether she experienced "any side effects from her medications," and Plaintiff responded that she suffered from "[d]rowsiness," but nothing else.  (ECF No. 13, PageID.90.)  Plaintiff explained that she did "a lot of sleeping" and was forgetful.  (*Id.*)  This alone is enough to establish that the ALJ considered Plaintiff's side effects.  *Cf. French v. Comm'r of Soc. Sec.*, No. 15-12687, 2016 WL 3951419, at \*13 (E.D. Mich. June 30, 2016); *Hale v. Comm'r of Soc. Sec.*, No. 10-10751, 2011 WL 1641892, at \*4 (E.D. Mich. May 2, 2011).  But to alleviate any doubt, the ALJ also wrote in her decision that she "considered all" of Plaintiff's "symptoms." (ECF No. 13, PageID.67–68); *cf. Stec v. Comm'r of Soc. Sec.*, 432 F. Supp. 3d 719, 727 (E.D. Mich. 2020) (holding that an ALJ's broad statement that she considered all of the claimant's symptoms was "sufficient to address the claims of medication side effects").

Nor is there any question as to why the ALJ found that Plaintiff's drowsiness would not cause her to be off task for an unacceptable length of time.  The ALJ mentioned that Plaintiff did not allege that she needed to nap as frequently as she did seven years prior. (ECF No. 13, PageID.67, 93, 107.)  Indeed, while Plaintiff napped for up to two hours per

day in 2011, by 2019 she only reported napping for fifteen to thirty minutes per day.  (*Id.*)

Plaintiff also fails to cite any medical evidence establishing that her medication caused

drowsiness, and apart from one instance where she reported sleepiness from nighttime

breathing issues, no examinations in her record mentioned fatigue.  (ECF No. 13,

PageID.358–59.)  Accordingly, not only did the ALJ consider Plaintiff's side effects and

write a decision that was detailed enough to allow judicial review, but she also reached a

finding on Plaintiff's fatigue that was supported by substantial evidence.

### H.      Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision.

Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 17), **GRANTING**

the Commissioner's Motion (ECF No. 19), and affirming the decision.

## III.     <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations.  A party

may respond to another party's objections within 14 days after being served with a copy."

Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States

v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 9, 2022                    S/ PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge